The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Good morning. I want to welcome you to the Fourth Circuit. Good to have you with us. Thank you very much. Thank you. This is Judge Thacker and Judge Richardson. And we have the case of the United States v. Joyner, Colby Joyner, number 244565. And Ms. Santillo, you represent Mr. Joyner. That's correct, Your Honor. May it please the Court. My name is Kristen Santillo on behalf of defendant appellant Colby Joyner. We raised a number of issues in our briefing, multiple evidentiary, instructional, and sentencing errors. But unless the Court has other questions, I want to focus on two sets of errors today. And the first is... Two sets of errors? That's correct, two sets of errors, because I believe that they complement and reinforce each other. So the first set of errors is the trial court's erroneous exclusion of all evidence relating to the overarching alleged charged health care fraud scheme on the grounds that it didn't bear on Colby Joyner's own conduct and intent, while at the same time, at the close of evidence, instructing the jury that they could find Mr. Joyner guilty under an aiding and abetting theory. I think that this is a fundamental due process violation, because critical evidence was excluded, which would have allowed Mr. Joyner to meet the elements of the case if he had been able to. But after the close of evidence, the jury was presented with a theory that he was unable to meet. And we cited authorities that were acknowledged to be valid by the Fourth Circuit. And the Second Circuit just recognized that that's a due process violation when the defendant is simply unable to meet the evidence on a theory that went to the jury. I think it's clear that the district court... Well, it's more than that he was unable to meet it. He did not have an opportunity to meet it because his evidence was excluded. Exactly. And it's just a fundamental due process violation. I think that's well established. Are you raising a constitutional question or an evidence-only question? Well, what I would say is that I think there was an error... I'm talking about Judge Conrad's ruling to exclude the evidence. Now you're taking the one to the Constitution. Well, what I think that... One of them is for abuse of discretion. That's the one you preserved here. Yes. No, that's absolutely right. We're making the evidentiary argument because I think it's incorrect. And I think when a trial court makes an error that's rooted in a misunderstanding of the law or a misapplication of a clear legal principle, then that is an abuse of discretion. In this case, the court said, well, Mr. Joyner's not charged in a conspiracy, so really the only relevant evidence is based on his own conduct and his past. But there's well settled law that scheme is very similar to a conspiracy, and evidence about the overarching scheme is relevant to bear on whether there was even an existence of a healthcare fraud scheme. That's an element of the offense. And so the court... He was charged as the principal and as a neighbor and a better. Correct? In seven counts. Correct. Correct. And those haters and the betters were identified. Those haters and the betters were not expressly identified. Well, they were identified as... Yes. Correct. Yes. And no one ever asked for self-particulars. Was the motion self-particular? No. I think there was an understanding that there was an alleged fraud scheme involved. So he's the only hater and the better that's charged. He's the hater and the better. And he's charged under section two as a hater and the better. And the hater and the better's principal under section two. Does that make any difference? It doesn't make any difference except the fact that the government has a burden to prove that they're going to establish hating and abetting liabilities if somebody else committed the underlying fraud. And so Mr. Joyner... The allegation is that he was hating and abetting and he's charged under section two. And the hater and the better under section two is a principal. Anyone that aids, abets, counsels, assists, et cetera, is a principal under federal law, under the U.S. Code, Title 18, section two. That's correct. I read section two to the jury. It's a misconstruction. Yes. But my point is that an element of hating and abetting liability is that there has to be another person who has committed a fraud. And Ms. Centello, isn't there a disconnect here between the reason the district court made for excluding appellant's evidence, which was that the appellant was charged as an individual, and then the follow-on hating and abetting instruction? Absolutely. The court's decision was... The court... Go ahead. Oh, I'm sorry. Go ahead. No, you go ahead. The court's decision basically said that the indictment focused on the conduct in the intent of joiner, and MCS is not on trial, but when imposing... Can I ask this question? I will confess, like Judge King, I didn't exactly understand this to be your argument, and so I'm just trying to make sure I understand it. Did you object to the hating and abetting instruction? Yes. And where in the brief is that a preserved issue? Where am I... I get the evidentiary issue, and I get the argument that there should not have been an hating and abetting instruction. I just haven't put them together, I guess, is what I'm... I'm just trying to understand why you grouped them together. Just help me understand that a little bit. So I grouped them together because I think that if there was going to be an hating and abetting theory presented to the jury, it was certainly relevant whether or not there were any other people who were in the seats who were committing fraud or, on the contrary, acting in good faith. And there was critical evidence included that people who worked at MCS with Mr. Joiner were acting in good faith, and they had good reason to believe that the protocols that were in place that Mr. Joiner followed were compliant with the law, and not hating and abetting them. So I just understood that instructions were completed by Judge Conrad. He asked for the council to advise them whether they had any objections, and they both said no. No, but there was an... Under Rule 32 of the criminal rules, nothing was done at that point. So how is that issue even preserved? That's the... I'm following up Judge Richardson's question. It was discussed earlier in the trial, or even before the trial, but when the jury was instructed, there was no objection there. After the jury was instructed, before they went to deliberate, no objection was interposed whatsoever. Well, so during the charge conference, the trial council objected to the hating and abetting instruction. This is in JA 539. I'm talking about Rule 32. And what I'm saying, and after the close of the case, they renewed all of their motions. They renewed all of their prior motions. They renewed all of their prior motions or objections? Objections and all their... Yeah. If I understand it, I have to go back and check the records that they renewed all their prior objections. That's what we want to see in the 539. You're saying that's where they objected to the hating and abetting instruction, correct? Yeah. And then what was the other objection you were directing them to? Well, obviously... I'm talking about after the instructions, before the deliberations, no objection was interposed. I would have to go back to the record and clarify that. But I think our argument stands that the jury was instructed on hating and abetting, and the evidentiary ruling is wrong. It's a matter of law, and it prevents the judge from being able to meet the theory. It was charged in seven counts with hating and abetting, section two. And the judge read the jury the provisions of section two of title 18, which is the charge against the defendant. He's the only one that was charged with being an aided abetter. They didn't name anybody else. They referred to others, and you never did ask who the others were. Well, there are specific people who Christopher White, MCS, other providers at the company where he worked. What the problem is, you're going to... And read, reviewed, and the like, unscrutable to the prosecution, the jury may have found them all to be hating and abetting, but the only one that was charged as an aided abetter was this defendant. Yes. And if there had actually been a trial to determine whether or not... Or a fair trial, or Mr. Joyner was allowed to present evidence about how the overarching scheme worked, it may be fine if there was an hating and abetting instruction. The problem is, at the beginning of the case, the government said, we're only focused on Mr. Joyner's conduct alone. He's the only person who's involved in this scheme. And the court agreed with them and said... The indictment says he is an aider of abetter with others known and unknown. Yeah, but it also lists specific people who are identifying the defendant. I think Mr. Joyner tried to... I'm sorry, I didn't hear that last part. Because you didn't ask who the known and unknown were. You could make a motion for a bill of particulars in a criminal case in federal court. You didn't do that. I don't think there was a mystery about who was involved here. I think that Mr. Joyner was the first unemployed for the company that did that. There was one person who was a client. I think the issue about the aiding and abetting is frivolous, to be honest with you. It's a waste of time. Now, your question on the evidence, it may be... It should be that you're trying to tie the two together. Well, I don't think they necessarily have to be tied together, but I think they are... The fact that the court erroneously excluded critical evidence on an erroneous legal theory, not healthcare fraud is... Can I ask a question, counsel? I just want to make sure too. Just for a minute, hypothetically, assume that I'm only asking about the evidentiary question as in isolation. I'm just trying to simplify. Help me understand why it would be an abuse of discretion to exclude that evidence under Rule 403. In particular, and I'm sure that you have a legal opinion or emails or somebody's report that a business is operating legally, is only useful if you know the precise information that they were providing. I can go to a lawyer and I can describe what I'm doing. If I do that dishonestly, I can get a letter from the lawyer that says what I'm doing is wholly legal. That may well be because I have misrepresented or failed to provide all of the details. Or I can provide all the details and still get the letter. But the point is, we almost never allow these sorts of mini-trials into a question of legality of conduct. Because if the lawyer was right or the lawyer was wrong, absent a reliance on counsel defense, that opinion letter can't change whether the scheme is legal or not. If the court were to have permitted the introduction, just to take the legal opinion as one example, although I think they're all in the same bucket, if the court had let that in, presumably then there would have had to have been multiple witnesses who then tried to describe what information was included or excluded when the lawyer was asked for that opinion to try to understand whether the lawyer's opinion, even though it can't provide legal guidance to the jury, that's what the judge's job is, whether it was reasonable or something that could have been relied upon. But we know it wasn't relied upon. And so I understand your relevant argument to the extent that you've made that. What I'm having trouble with is understanding why under 403, this isn't like paradigmatically the kind of evidence that we say is not sufficiently probative to allow us to get into this sort of full sideshow about what information was provided and how it's provided, given that he never saw any of it. Can you just walk me through that a little bit? Absolutely. So I agree that the legal opinion is probably one of the most more complicated pieces of evidence that was excluded, but there's much more straightforward evidence that was excluded. Well, we start with the legal opinion. And then if you want to explain why the legal opinion, maybe you think the legal opinion was properly excluded, why it's different for the others. Just to me, the others are like basically the same problem as the legal opinion. So you can respond any way you like, I guess. I started with the legal opinion, but if you want to skip that one and go to something else, that's fine too. Well, I would say that I'll give you an example. The government argued to the jury that Mr. Joyner must have known that this was illegal and that he was keeping the fact that he wasn't a practicing nurse from his employers. And any medical professional would have known that the statements that were in these forms were false. The excluded evidence shows that the medical director at NCS was sent all of the forms that Mr. Joyner signed. These are pre-populated forms that were created by somebody else before Mr. Joyner joined the company, were sent all of these forms in June, 2018. And he was asked to review the process for compliance issues. So he started reviewing those forms for months before there was a training video that was shown to Mr. Joyner, which the government claimed was an obvious fraud. And he says on the video that he dotted his I's and crossed his T's when he was reviewing the compliance. But all of that presumes that he's not a criminal. We would have to have a whole discussion about what information he had and what was done. And so where he's relied on it is one thing. But whether what he was doing was legitimate or whether he had the right information would be a whole separate trial about whether this person was doing that. And so that's his reliance. I'm still having trouble. That seems to me like no difference in the legal opinion. You want to say it's a medical opinion. I don't think there actually is a medical opinion, but you'd call it a medical opinion. But it's this sideshow that 403 specifically seems to be designed to not require a trial judge to let take place. Could discretion to trial judge? Yes. But the issue is that Mr. Joyner would be held potentially accountable for the criminal conduct of his boss. And this is an email that shows the good faith of his boss. No, no. The email doesn't actually show his good faith. It doesn't show his good faith. It goes to his boss' good faith. And he'd be held accountable for aiding and abetting his boss. That's what I'm saying, is that he's not able to- Your argument is his own faith that establishes the boss' good faith. And if I disagree with that, then you agree that the district court judge acted appropriately within his discretion. Well, I think there's a number of things that show that the people who are working at MCS were consulting people, they were trying to be compliant, they were researching issues, including the central issue in the case. What does the term patient mean? There was actually an email where they were given a definition of the term patient that said that that term can extend to asynchronous encounters. They were comforted, it was right around the same time that Mr. Joyner was trained on this protocol, that that term is consistent with the form. Thank you. I appreciate it. Sorry, Judge King, I know I've ran you over, but I appreciate the opportunity to hear from counsel on that issue. Yeah, that's their problem, Judge Richardson. And I want to mention one more thing. As long as you get questions, you need to go ahead and answer them. And I'm going to get to Judge before we go to the government. But I've got to make a correction and an apology to you. I say Rule 32 about objections. The instructions and the correct rule is Rule 30D, I'm sorry, of the criminal rule, is about objections. And you have to make them at the right time after they've given a specific objection before the deliberation. And here, neither side made any objections after they were given. And as to the dating and the bedding, the court did nothing but read the statute, which is cited in each count, the seven counts, the dating and bedding statute, word for word. Yeah, and I don't think that... Word for word. I don't think there's an argument that dating and bedding instruction was wrong if it was appropriate to be given. I don't think that there was an argument that it was misread or that was a misstatement of the law on dating and bedding. It just never should have gone to the jury when there was an objection about that issue. Well, and isn't your point also that giving that instruction highlights the error in excluding appellant's evidence in the first place? Exactly. Exactly. So I also just want to say I, for one, don't think that your argument is frivolous on that point, Ms. Ventilla. Thank you. I realize I'm out of time. Does anybody have any other questions? As long as you get questions, you answer them.  Thank you for sharing. So, I'm sorry, I'll pass it over. So Judge King, you can't see, but I think Ms. Ventilla is finished with her argument. I can't see. I don't know what. Has she been muted? No, I think Ms. Ray is ready to go whenever you're ready for her to go. Anybody, are you finished with the counsel for the appellant? Yes. I don't want to touch you up on counsel for the appellant. Yes. Thank you, Your Honor. May I please support Amy Ray for the United States? Your Honor, Mr. Joyner got a fair trial and his sentence is procedurally reasonable. I will turn first to the question of the evidence, and I want to make a few notes. First of all, this isn't a constitutional claim. United States v. Malloy, 2009, it's in our brief. He was allowed to present evidence that everybody else acted in good faith and they all thought they were in compliance. And so it wasn't as though he wasn't allowed to argue his primary defense. And what Malloy said- No, Your Honor. It was also, for example, emails on page 397 to 398. There are emails that he received in which it says, our practice is conducting a professional and compliant operation. The practice is guided by a veteran medical director who has over 30 years of experience. The medical professional- Nobody could talk about the medical director, right? Well, I mean, Mr. Joyner- Which one was the medical director? Okay. Yeah. Mr. Smith. And I think, Judge Thacker, if I believe that if the court looks at the entire record, it's very clear that he was allowed to present his defense. And so in terms of the standard of review, the crux of the argument is evidentiary. It is not constitutional. And so it is an abuse of- Yeah, I agree with that. Thank you. And so that means Judge Conrad had to be arbitrary or capricious in responding, in including the evidence that- I'm sorry, Ms. Ray, but can we back up? Could you just explain to me what the scheme here is supposed to be? Because I can't quite grasp what the scheme was supposed to be here and what was in it for Mr. Joyner. Oh, okay. Sure, Judge Thacker. The scheme was a telemarketing scheme where there would be client companies and one of those companies was run by Mr. Smith. And the client companies had people who would hold calls elderly folks. And they would call these folks. And in fact, there's evidence in the records that they would call five times. And if they didn't receive an answer in five times, that was good enough. They could let it go. But in any event, they would call these elderly folks and they would say- I mean, what's the scheme on the part of- What is the scheme on the part of Mr. Joyner individually? Because that's why his evidence was excluded. At least that's what the district court said. Well, that was part of why the evidence was excluded. And I do want to answer your question, but I also want to make the point that it was also excluded under Rule 403. And although Mr. Joyner cites Rule 403 in his opening brief, he makes absolutely no argument. Well, the district court also didn't really make a Rule 403. Where did the district court do a proper Rule 403 balancing test? The district court, in its written order, explained that it was misleading and it would lead to confusion. In its written order? Yes. Yes. And also, he did talk about Rule 403 in the oral order as well. Where's the balancing test in the written order? I mean, first of all, I do want to return just to one point, Judge Thacker, if I may. And I do want to answer your question. But I also want to say that an argument that is not- that a passing shot is made, right? No argument is developed in the opening brief about Rule 403. It is our position, and I think it's a strong position, that the defendant has waived any challenge to the Rule 403 decision. No, I understand that argument. They may- I mean, the court analysis even- the two are intertwined, 401 and 403, at least in terms of how the court handled it. But I understand that you're saying the appellant waived it. Absolutely. And I think that there was no- in other words, the appellant never said anything about a balancing test in her opening brief, or his opening brief. But in terms of- You think- just before I know you're- we're distracting you, but in a trial, do you think there is a requirement that a trial judge from the bench ruling on 403, did it orally articulate the reasons for the 403? I do not. And not only that, but I think there is no requirement that in a later written order, the judge go into any detail about the depth of the balancing test. The Rule 403 requires that the judge conduct one, so if this court were to look at it and say, oh, there's no way a reasonable trial judge could conclude that this would lead to possible confusion of the jurors, then that's fine. But there was no requirement for Judge Conrad to go into any detail. Now, I do want to address, Judge Thacker, your suggestion that these were intertwined. They were intertwined insofar as 401 is a relevant objection, and part of Judge Conrad's issue with 403 was that it would lead to- that it was unnecessary. But also, he said it would lead to confusion of the jurors. And there was a good reason for that, because Mr. Joyner had never seen any of these emails that were excluded. And those emails simply said, we think we're compliant, but they gave no context as to why they thought they were compliant or what exactly, you know, they would respond and say, we're trying to be compliant. And that's the 403. I don't- how are they not relevant to this scheme as you've described it? Because you- when you started describing the scheme for me, you started- you talked about the company and the- and that it's run by Mr. Smith and all that. How are documents about the company and how they ran this operation not of any relevance? So, I was- in my- I may have misunderstood your question earlier. When you asked about the scheme, I thought you were asking me about the broad scheme and not just about Mr. Joyner. I can answer that more- I am just asking about Mr. Joyner, because I just don't understand what the scheme is with respect to him. Does the government agree that Mr. Joyner got paid the same regardless of whether he ordered these tests or not? Yes, but he ordered multiple tests for everyone, whether or not- even when the supposed medical screening that happened reflected no case for the pharmaceutical test or for cancer test, he ordered the test. The reason- he didn't interact with us. He signed orders for about 600 beneficiaries, but over 14,000 tests were run based on the orders that he entered, because he went through and just checked every single one of them. The reason his part in the scheme, Judge Stacker, is this. He did not- he did not- he said that they were medically necessary, and he went through and just signed his name. He didn't review it. He did all of these in under five minutes, and so he said they were medically necessary. They were not. He said that these folks were his patients. They were not. He said he was going to follow up and provide care based on these tests. He had no intention of doing that. So his role in the scheme was first he had the Medicare enrollment that they needed. He was a licensed Medicare provider. He did not comply with the Medicare rules, but he also flat out lied every time he signed that something was medically necessary when he did not do any assessment as to medical necessity. So that was his role. Now in terms of whether or not everybody else thought that he was compliant, and let's say an email between Ms. Colehill and Ms. Smoltz where they- And he did all that for what? For money. He paid- But I thought you said he made the same- I thought you agreed with me that he made the same amount regardless of whether he ordered the tests or not. Yeah, the problem is he pretty much always ordered the tests, so I don't think that that fact is very helpful. But that didn't change how much money he made. You said he did it for money. He did it for money because they would send him patients and he could in five minutes, he could earn money because all- But he earned the same whether he ordered the tests or not. Right, but he did order the tests. He ordered tests and cost- In fact, I don't understand this. When the defense counsel tried to ask the investigator at trial if there was any evidence that any of the money went to appellant, the court sustained the government's objection. The government didn't want that question answered because of all the stuff that was excluded because of the earlier ruling. For some reason- I don't follow your honor on that, Judge Thacker. I think that the reason the government didn't want that into evidence was it was irrelevant as to whether or not he told lies. And he was charged with conspiring to commit healthcare fraud, but I- Did any of the money go to appellant? Did any of the money go to appellant? The money that went to appellant was the money that he was paid for signing and ordering tests. That's his basic salary from the company, right? Well, yeah, except it wasn't a It was a payoff for ordering the unnecessary tests. But we already agreed that he got paid regardless of whether he ordered the tests or not. He got paid the same. There was an understanding, Judge Thacker, that he would order tests, and he ordered so many tests that the government- I guess my problem is I just can't understand what the scheme to defraud is individually on behalf of Mr. Joyner. And I did understand the court to be excluding all the evidence that it excluded because it said this was about him individually, and all the rest of this doesn't matter. With all due respect, Judge Thacker, that is not an accurate assessment, and I'll tell you why. And I appreciate- I'm not suggesting that- Anyway, here's the deal. Just tell me where to look. The government- I'm going to answer your question by saying the government never said that Mr. Joyner was committing fraud by himself. That was not what the government's position was. The government's position was he was a cog in a larger wheel. Yeah, yeah, I know. I know. And that's where my disconnect is because the government does say he was a cog, and I understand that whole cog in the bigger conspiracy thing. I just don't understand excluding all of his evidence of the bigger conspiracy. They didn't exclude all of his evidence. He comes to testify. He testified, and all the evidence that they excluded- For the government. Evidence he never saw. How could evidence about emails he never saw be relevant to whether or not he had an intent to defraud? It's evidence of the bigger- of the company's conspiracy. Sure, but we didn't need to prove- We proved- And by the way, if you just look at the training video, I think it becomes pretty apparent that he is part of a cog in a quite illegal wheel, right? And so, they saw the very current evidence that this was a broader scheme, which makes sense. They should because he's charged with participating in a scheme to defraud. And I understand all that. It's just what doesn't make sense to me is excluding the evidence that would have given him the opportunity to fully present his case, including- We haven't talked about the subpoenas for the witnesses. I mean, two of them, the subpoenas were acquired without them even being there. There's nothing on the record. There's nothing set out on the record that they- What the questions would be or whether they would refuse to answer. No individual assessment. Could you talk about that and why you're here since you won't get another chance? Yeah, I'm happy to, and I appreciate your question. So, first of all, it's an abuse of discretion standard of review, and I think that's important. And the reality was, and first of all, I guess I'll go back. This amendment, right? The relevant touchstone is whether any adverse consequences can be visited upon the person who's being asked to testify. That 2025 is the court's decision in Oliver. What Judge Conrad did, and in their motion for subpoenas and their memorandum in support, they accused every single one of these folks with wrongdoing. They accused not only White and Smith, but also Medcare. Right, but then they altered that theory before this decision was made on the subpoenas, right? Well, they said they did, and yet they had repeatedly, from the beginning of the trial, they had said that this wasn't his fault. Everybody else was at fault. Mr. White was at fault. Dr. Smith was at fault. That was the working theory. Now, Judge Conrad has to protect those individuals' Fifth Amendment rights and privilege not to incriminate themselves. But there should also be a record of self-particularized inquiry, as two of the witnesses never even appeared in court, did they? Well, yeah, because that's right. I mean, they weren't there, but they had written the letter. They had said they were going to assert the Fifth Amendment right as to anything that was asked. And what Judge Conrad did, the particularized inquiry, and I'll quote from the Supreme Court's decision in Hoffman. The district court must be governed as much by his personal perception of the peculiarities of the case as by the facts in evidence. What Judge Conrad, after watching this evidence for a couple of days, understood about the theory of the case, he knew that if those folks got up on the stand, there was every likelihood that they were going to be asked about their participation in what the government understood and what Mr. Joyner understood was an illegal scheme. And so they chose, they said, I think these questions will interfere, will tend to incriminate me. My answers to those questions. Very reasonable, I think, for Judge Conrad. And so no particularized inquiry was necessary based on that. Judge Sackler, I apologize. With all due respect, I think there was a particularized inquiry. How could there have been when at least two of the witnesses didn't even come to court? The inquiry doesn't require an in-person evidentiary hearing. The inquiry requires that he consider their personal circumstances, the theory of the case by the defendant, what questions might be asked. That's the inquiry. It does not require, I have not read one decision that requires that the judge receive in-person and have an in-person policy. And the reason he didn't in this case was because they were in California, because defense attorney misled them about when they needed to be back. I mean, you're in North Carolina and I'm in West Virginia, and here we are talking. So it's Well, it's possible if they cooperate, the witnesses. But more importantly, he heard from them. Or if they have the information from defense counsel that they need to make arrangements to be there. Yes. And also, he heard from them through their counsel. Ms. Colehill and Dr. Smith were, the counsel made very clear in the motion to squash why they were going to assert this. And I just don't think that it's an abuse of discretion for Judge Conrad, who has, of course, watched a lot of trials and heard a lot of trials and presided over them. He knew what the theory of this case was, and he determined that any questions were I still don't really understand the theory of this case, because I don't understand what the government thought was in it for Mr. Joyner. I mean, he was getting paid regardless. That's what I can't understand. Is the implication, counsel, that if Mr. Joyner had stopped ordering 17 tests at a time, that the company at some point would have stopped sending him clients to review? Yes. Thank you, Judge Richardson. Well, this is his second, this is his like sort of part-time job, right? Oh, yeah. He's making $70,000 a year. at this job. And he also said he was going to be able to make $60,000. But we don't know how much Mr. White or the others made off of this scheme, because the government objected to any questions about whether the investigator traced the money. That's because the money that the government cared about was the government's money. This is a health care fraud scheme. The entity that paid the most money was Medicare. It was $3.6, $3.something million. But then why wouldn't the government have traced, what's wrong with the question as to whether the government had traced the money that went to the laboratory? You're saying because the money that matters is the government's money, not the laboratory. There were two types of money, I think, that matter. I understand what you just said, because it's the government's money that you care about and not... It's a health care fraud scheme. It's a Medicare fraud scheme. And not the people that were part of the scheme. Well, right. Not the people who weren't Mr. Joyner. I mean, we did explore how much he made. And he... Well, no. No, because when defense counsel asked if there was any evidence that any of the money went to an appellant, the court, again, sustained the government's objection. Well, you care about when it's the government's case, but then, well, not you. But excluded, that exclude everything that he tried to do. They all did, in fact, Your Honor. Judge Conrad did not exclude everything he tried to do. And I guess, okay, Ms. Gray, in your last time, I still think he's been able to fully answer what is it that he was permitted to do, to put in evidence. He was permitted to... First of all, he cross-examined our witnesses, and he regularly asked about whether or not he would have known and what input he had. Was he aware of the fraud, et cetera? And then they put in... He put in the training video, which says, we're compliant. And he testified, and there were emails that the government put in where he was told that they were compliant and professional. He made it very clear in his... I see that my time is up. Judge King, may I finish, continue answering questions? Okay. I'm getting a nod. Thank you. As long as you have questions, you're going to have great time. All righty. I'm happy to. I loved it. Anyway, so your question about... You were giving me a listing of all the things he was allowed to do. He put the video in, he testified, he cross-examined witnesses. Yeah, there were emails. I mean, I think you'll be hard to read this transcript. His opening statement identified kind of who was responsible, it wasn't him, and why it wasn't, and then the closing, and then he was relying on all of this evidence that he didn't know. And there was a lot of it, including the emails that I quoted from earlier, where he was emailed and it said, hey, we're compliant, we're professional. There's a lot of evidence in this record. And the line, can you just explain a little bit that line? You said he was allowed to put in all the evidence and records that he saw or had knowledge of, and so that's this last bucket that you've described, that he was allowed to put in anything that he saw or had knowledge of, part of his calculus. What he was not allowed to put in were just those things which he had no knowledge. Exactly. That's right. Exactly. If he did not know that there was an email between Ms. Caldwell and Ms. Mola saying, oh, well, we better make sure we're compliant, that doesn't have any relevance to his intent to defraud. And then the second point you made is to determine whether it goes to good faith or not, we would actually have to explore the purpose and the input behind that email, because it could be a CYA or it could be an honest good faith effort, just like a lawyer's letter can be a CYA based on incomplete information or it could be an honest good faith effort. And those sort of side trials, particularly in line with the privilege issues, were why the 403 issue was appropriate. Absolutely. And I will note that the legal memorandum, for example, Judge Richardson didn't opine at all about the scheme other than whether or not it violated anti-kickback law. And even that, as your Honor pointed out earlier, we don't know what was said. And the defendant hasn't identified the policies that they think should have been admitted. But most importantly, the jury had to determine what was in Mr. Joyner's mind. And if he didn't read it, the judge could make, I think it wasn't arbitrary or capricious for him to decide that all of those side issues weren't relevant and would cause waste of time, confusion, et cetera. Your Honors, I hesitate to close without addressing the aiding and abetting issue, but I'm also happy not to do that if your Honors don't have questions. Give us the short version. The short version is there's nothing inconsistent with his being possibly liable as an aider or abetter to a larger scheme that the jury heard evidence of and limiting what evidence the jury heard to evidence that it went to his particular intent to defraud. I don't think there's any inconsistency there. I do want to make one note in the reply brief, and this just is important to me, Mr. Joyner suggested that the government had conceded that the false statement instruction was wrong. We did not concede that. I jumped to plain error because I thought it was a pretty strong argument. I don't think actually, as I looked at it further, that it was erroneous under Thompson, but I just want to make sure that we're clear. I didn't make the argument that it wasn't, so that's fair, but I did not under-concede it. I just want to make clear about that. Ms. Gray, don't you sound that- Yes, sir. Those three issues, I think there's three, two or three about sentencing. We didn't give counsel Ms. Santella an opportunity to mention those, but I want you to address the sentencing issue. Happy to, Judge King. There were three sentencing issues. The first one was intended loss, and the district court went right with the guideline, which is you should use intended loss, and in a healthcare scheme where the government's money is at stake, you use the amount that was billed to the government, and that's the presumption, that's the prima facie case. There wasn't- Oh, there we are. Sorry. For a second, my screen said we were disconnected. The guideline doesn't say anything about victims with respect to mass marketing. It does say- Can I go back, sorry, Ms. Gray, to the first one? On the intended loss point, I understand the presumption that we use the intended loss amount, but we do that only when reasonably foreseeable to the person, and I guess, help me understand why it was reasonably foreseeable here of 10 million? Yeah. I'm sorry. I just had an interruption because I think that somebody called us to tell us the meeting was disconnected. Your Honor, your question was, why was it reasonably foreseeable to him? What evidence supported the notion? I would just say, I'm not a doctor or a PA, but when I saw 17,000 tests, my first move was not to $10 million worth of tests. What evidence was it that it was reasonably foreseeable to him that these tests were as expensive as apparently they are, that that $10 million number would have been reasonably foreseeable to him? Yeah. I don't think there was evidence specific to him about how much the test ... I don't recall evidence about how much the test cost that he would have known, but what he did know was that he was part of a massive team. Let's assume, even in restricting it to the amount of money that he ... The money that was billed to the government because of his particular test, we could have drawn much broader underrelevant conduct to everything that was reasonably foreseeable to him. If you look at the number of folks who were on the call and the nationwide scope that this operation was trying to achieve, I don't think a $10 million billing is unforeseeable to him, but I don't know of any particular evidence that said this is what he needs. I think what the judge was doing was, Judge Conrad was simply looking at the commentary to the guideline, which said, use the billing amount. He did that, and then he varied downward and further with the amount that the government actually had suggested, which was the amount of money that was actually billed to the government as a result of Mr. Joyer's fraudulent activities. Does that answer your question enough? Yes, it does. Thank you. Maybe I'm satisfying, but that's the best I have, I think. What about the mass marketing issue? Yes, sir. The mass marketing just came with ... There's nothing in the guidelines that restricts the mass marketing increase based on the number of victims under, say, the Mandatory Victim Restitution Act or whatever. There's not anything that limits how we would define how many people were involved with the mass marketing. That's not in the guidelines text, nor is it in the guideline commentary. What the 11th Circuit, the 5th Circuit, and the 2nd Circuit have all recognized is, look, these folks whose health information was taken, who were the targets of telemarketing, and in this case, there's a really strong argument that they suffered some harm because the evidence was that if they got these tests, they probably were not going to get them covered again in their lifetime. If there was a genetic screening done for this person, they probably wouldn't be able to ever have it again. I happen to know that ... We all know that the genetic markers change. Scientists discover all the time new genes that are related to particular illnesses. They did suffer harm. The 2nd Circuit recognized even in the decision in Lacey, which Mr. Joyner relies on, that if there was evidence that the folks who were required for the fraud to occur suffered maybe any harm at all, then it would be an appropriate increase. But the 11th Circuit and the 5th Circuit both say, hey, victim isn't in the part of the guideline that talks about mass marketing. It doesn't matter how many victims were. The question is, did he employ mass marketing? Here, we have lots of evidence that it was telemarketing. In fact, even Mr. Joyner himself said, I feel like it's telemarketing. Does that answer your question, Judge King? It does. Okay. Thank you. Go ahead. I'm sorry. I'm sorry. I was just going to address the last sentencing issue, which is the abuse of trust or special skill. And Judge Conrad relied on his status as a Medicare-enrolled provider and also on his skills as a physician assistant and highly educated. And I think that's well supported by the guideline. And actually, the defendant doesn't even contest the special skill increase in his opening brief. And so I think he's waived that issue in any event. Your Honor, I'm happy to answer any other questions. Okay. Thank you. We request that this be court-affirmed. Thank you. Ms. Santilla? Yes. So just following up on some of Judge Backer's questions, I do think that the court's relevance ruling was used by the prosecution repeatedly to police questioning in the case and to restrict any of the evidence that Mr. Joyner tried to submit to establish how the scheme operated, to establish any reasonable basis to show why he believed that the term patient was not false. And I wanted to point out the question that Judge Backer referred to- You don't understand that last statement, that they limited the evidence that would have provided a basis for his belief that patient wasn't false. And why would that be true? I mean, imagine you had the CEO, who is a man of impeccable honor and integrity and also a lawyer and doctor and Indian chief and everything else, right? He's the perfect person. The fact that he said patient means X, if Mr. Joyner didn't know about that, why would that legal opinion be relevant in a trial? I don't care how good the CEO is. He doesn't instruct the jury on the law. That's the judge's job. And if Mr. Joyner didn't know about it, it obviously couldn't have gone to his state of mind. So I guess I'm just having a little hard time understanding why, even if somehow this evidence was on its face reliable rather than requiring many trials, why it would have actually helped establish some facts of relevance for you. Well, I would ask you to focus in on what the prosecution's argument to the jury was, which was that these were open and obvious lies that any seasoned medical professional like Mr. Joyner should have known were false. They didn't just say Mr. Joyner knew it was false. They said every seasoned professional would have known it was false. And they said Mr. Joyner, essentially he was acting on his own against NCS, against his employer, and that he was making these decisions. And if he had consulted Dr. Kevin Smith, who's on these emails, as a supervising physician, he would have told him that it was obviously false that he was the patient because there was not a real-time encounter, right? So the last part of that, where do I look in the record to see whether government argues that had he contacted Mr. Smith, Mr. Smith would have told him he was committing false? It was in a remote summation when he said that Mr. Joyner hid the fact that he was, or he basically shielded himself from supervision by Kevin Smith because anybody, and his own supervising physician, because anybody who is a doctor who's looking at this would say that it was a fraud. And so I think the fact that that very person is actually looking at this issue very carefully, actually consulted with the American Telehealth Association about how to define the term patient and received a response from the American Telehealth Association that says that ATA officially defines a patient encounter the same way that CMS does. Any encounter where medical treatment is provided and or evaluation and management services are provided. Do you think that legal opinion, whatever it is, I actually don't know whether it's right or wrong, that you could introduce that as evidence of the law? I think that I can. I'm sorry. No, you go ahead. I think that you can introduce it as evidence that somebody was provided an alternative definition and somebody reached out to try to find out if there was an alternative meaning and that there's not one open and obvious meaning of what the word is. So I'm not asking for anybody to accept that specific definition for what the law is, but just that reasonable people can disagree and that the people at MCS, who he was accused of aiding and abetting, looked into this issue. They created, Mr. Joyner literally did that. It sounds like he was accused of aiding and abetting them, but then also the government's theory was in part that he hid from them. Yes, at the same time. The same cannot boast. Well, those two things, again, seem somewhat inconsistent to me, but I would like to get back to you. We're trying to read a question and answer from the trial earlier. Oh, I'm sorry. The question, I just want to make clear, the question was, do you have any evidence that any of the money that was paid to us through Medicare ended up with Mr. Joyner? So it was about the government's funds. That is the question. Oh, so it was actually about the government's funds and not about the live funds. Yeah, through Medicare, ended up with Mr. Joyner, and then there was an objection. But why is that relevant? So the question is whether the $17,000 he received in fungible dollars could be trade to the $3.6 million that was paid. Why would it matter whether the $17,000 that he was paid is directly traceable to the $3.6 million or not? I mean, I have no idea what the relevance of that is. He got $17,000. Well, if he's trying to scheme by himself to defraud somebody, he's got to have an intent to defraud Medicare. But we know $3.6 million went in. We know $17,000 went out, right, from Medicare. And the jury found that he was paid $17,000. He was paid $17,000 by MCS, but there was no evidence, because it was excluded, of the relationship between MCS, Christopher White, the laboratories. Or where the funds went, because when an appellant tried to ask about where the Medicare funds were traced, the government objected and that was excluded, or the objection was sustained, correct? That's correct. And the government also asked questions about who Christopher White was. Christopher White was the mastermind of this scheme, this nationwide scheme. And Mr. Joyner tried to ask a question about Mr. White's relationship with the laboratories, and there was an objection. That information never came out that Christopher White was receiving kickback from the laboratory. And nobody at MCS was. Mr. Joyner certainly wasn't. That was the nature of his elaborate fraud scheme. Can I just ask you to connect, just so I understand, these objections that you're describing, are you bringing, have you challenged those as like individual evidentiary decisions? Why are they relevant? If I'm writing an opinion, I understand that. I think she just brought, in fairness, I think because I brought that up when I was questioning Ms. Ray, as it just, go ahead. The reason I'm bringing it up is because the court wholesale excluded all emails, all questions about anybody besides Mr. Joyner, and based on this one ruling, excluded any evidence of how the overarching scheme works. I will just note that the reason I think it's relevant is because the government objected to that question. The objection is relevant to the court's prior order, which is the order on irrelevant. So they were using this to really rein in any evidence about anybody besides Mr. Joyner, but then they're trying to hold him liable, saying that he was aware of red flags as an obvious fraud that was being committed by other people, including Christopher White. He couldn't ask a question about Christopher White. And you think that you've raised and preserved that argument, distinct from the question about the exclusion of the evidence that sort of seems most obviously raised in the brief. Do you think this separate argument is also raised by your brief, and we should consider sort of this, in essence, this Mallory kind of claim? Well, I think that, first of all, I think, I see it as part of the same plan, so maybe there's a disconnect, but I absolutely believe Mr. Bradley raised the issue that he was not allowed to present evidence in the overarching scheme. Your argument is that, I think, as I understand it, is that the exclusion of that, what you say is relevant evidence, right, before the trial, permeated the trial throughout, because even on these objections that I've raised, the court and the government used the prior exclusion of the relevant evidence as the basis for sustaining those objections. Is that right? Yes. And the court followed along and said, yes, by sustaining those objections. And Mr. White, obviously, this extends to the other issue that was raised during Appellee's argument about the exclusion of witnesses. Mr. White was in the courtroom, and he was excluded from, or he was allowed to assert the Fifth Amendment, even though he pled guilty to taking kickbacks from the very same laboratories for the very same test that Mr. White was being part of that health care fraud scheme. And he was in the courtroom with a lawyer, and he never had to answer a single particularized question about why he would be able to assert the Fifth relating to his overall role in the scheme, when the defense lawyer said, we just want to ask him about what was in his slave remit. Ms. Santillo, we've filed this furlough multiple times already. I want to actually give you an opportunity to say anything you want to say about the three sentencing issues. Can I just raise one thing, which is I think that even if people disagree with me on the Fifth Amendment and the evidence, the government's commentary on that was prosecutorial misconduct, that I think further undermines the fair trial, because they knew that evidence was excluded. They knew the witnesses were excluded, and they, at the outset of the government's removal, you talked about the lost amount. Yeah. Well, this is an example of Mr. Joyner being held accountable for laboratories he wasn't allowed to present any evidence about. There's no evidence he had any idea how the laboratories were connected to the scheme, how they built, what they were doing. So I don't think it's reasonably foreseeable to any single way that they would bill $10 million for these claims. The government, when it was advocating- He's like a medical professional that sort of lives in this way. It's true. I don't know how much one of these tests costs, but it seems like to me there is this prima facie idea that the amount billed is the right loss number here. The government did not seek him to hold him responsible for what would be foreseeable for all the other people he saw doing the same things that he was doing. I understand your argument, but why is it that sort of like the very nature of medical billing? Well, I think it's important to clarify that Colby Joyner never billed Medicare for anything. His services were never billed for. Yeah. I understand you can argue guilt too. That's totally fine. No, no. I'm saying- If that's your argument, I'm totally fine. So that's good. But do you have an argument that's not about guilt? I don't think this is about guilt. I think it's about reasonable foreseeability. I think that it makes sense to hold people accountable when they bill for intended loss based on the facial amount of what was billed because that is their intention. It's more closely tied to their intention. But because the laboratories were billing at a separate mechanism that we never even saw what they submitted to Medicare except through the claims data that Mr. Joyner never saw, there's a bigger disconnect between his intentions about the billing than there is in an ordinary case. So that was my point on that issue. When the government was advocating for actual loss, they noticed that the amounts here were speculative. They're usually double billing in these cases and things may have been processed more than once. They identified potential ways that there could be errors in this data. And so they advocated for a $3.6 million actual loss and they also- How about the mass marketing issue? I think that if you look at the way that the guidelines, I think that we cited the analysis of the second circle, which is in our favor in terms of having the basically noting that the fraud guidelines essentially tied victims to the pecuniary loss of the victims in the cases. That's how it's defined. And that is victims of the offense. Here, Medicare was the intended, was the victim of the offenses. And I think that there were also, there were also, in the cases where people have been held accountable to the telemarketing, they had a much more active role in the telemarketing itself. Mr. Joyner was really asked to apply specific criteria. He did. He applied tests that I think were clear on their face, but he had very little interaction. He was not out mass marketing to people. And so I think his attenuated from the actual telemarketing activity also distinguishes him from some of the other circuits that have held it, where the defendant himself is using telemarketing to target victims that the enhancement is appropriately applied. So I think on the law, the term victim is used in the same guidelines that the mass marketing is used. And I think that it has a specific context in this case of people who are targeted to part with their money. Here, what the government has talked about is not a pecuniary loss. And I think that there is a distinction over the entire fraud guidelines along those lines. And it makes sense that this would only extend to Medicare. Very much appreciate it. Did you have anything else you want to say? No, I guess I just want to emphasize that I think that the evidence here were very much compounded by the prosecution. Over those about three or four times, I think, the evidence issues. Well, I'm talking about the prosecutorial conduct, the government commentary that Mr. Joyner didn't present the evidence so that the jury should give less weight to Mr. Joyner's effort to mount a defense. I think that there's clear law that that is highly improper. And I think that that was an error that compromised the trial. Even if the court were to find that the evidentiary rulings were correct, it really drew the inference that Mr. Joyner chose not to put on evidence because it would have been harmful to him, when in fact, the court excluded witnesses for testifying in light of their Fifth Amendment rights. And, you know, it's well settled. There's a long line of authority that says that highly improper and prosecutorial misconduct. And I think that one's reversed too. Ms. Santillo, I think we can, I can tell you as we conclude that I think you're possibly well represented in this field. Uh, we are, uh, we appreciate your arguments and presentations as well as those of Ms. Ray. And, uh, I'm satisfied that we can take the, this deal under advisement, uh, and adjourn the court for the day. Madam Clerk. Thank you, sir. This Honorable Court stands adjourned, signed by God save the United States and this Honorable Court.
judges: Robert B. King, Stephanie D. Thacker, Julius N. Richardson